**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | |
|---|---|
| **AMY HURST, individually and on behalf of all others similarly situated,** | |
| ***Plaintiff,*** | |
| **v.** | **Case No. 3:25-cv-734** |
| **MY TECHNOLOGY, INC., d/b/a MyPrize.US,** | **CLASS ACTION** |
| | **JURY TRIAL DEMANDED** |
| ***Defendant.*** | |

## CLASS ACTION COMPLAINT

Plaintiff Amy Hurst ("Plaintiff"), individually and on behalf of all others similarly situated, hereby alleges the following against Defendant My Technology, Inc., d/b/a MyPrize.US ("Defendant" or "My Prize"), based upon, *inter alia*, the investigation made by her counsel, and based upon information and belief, except as to those allegations and experiences specifically pertaining to Plaintiff which are based upon her personal knowledge.

## NATURE OF THE CASE

1.     This case arises out of Defendant's operation of an illegal online casino in violation of Alabama law.

2.     Defendant owns and operates one of the most popular and profitable casino and sweepstakes gaming websites on the planet called MyPrize.US, available at https://www.myprize.us.

3.     In My Prize, users can access and play thousands of popular casino games, including, *inter alia*, slots, roulette, baccarat, blackjack, poker and scratch cards (the "Chance Games"). Some of the Chance Games can even be played with real dealers in real-time.

4.      The Chance Games, are undoubtedly, games of chance. The Chance Games that are offered on the website are gambling, and are no different than if they were played in a Las Vegas casino. Their outcomes are determined primarily, if not exclusively, by randomization—rendering them indistinguishable from the game found in traditional, brick-and-mortar casinos.

5.      The trick is My Prize markets itself as a "social casino,"  which is simply a title to mislead regulators and consumers into believe it offers harmless gameplay instead of unlawful gambling.

6.      In reality, My Prize players can buy chips, gamble and cash out for rewards—just like at a regular casino. Indeed, My Prize owes its overwhelming success to its authentic casino gaming experience, including games from a myriad of reputable gaming studios, generous bonus programs, and diverse, fast-paying banking options.

7.      My Prize generates revenue when players make purchases for its in-game currency—which are tokens that allow consumers to play the games offered on Defendant's website.

8.      There are two forms of currency: "Gold Coins" and "Sweeps Cash." While Gold Coins are offered with promotional bonuses such as sign-up rewards and daily refills, ensuring continuous user engagement, they are marketed as having no real-world monetary value.

9.      My Prize claims that its Gold Coins are recreational play that have no real-world value. But what it does not tell its customers is that it bundles the Gold Coins offer with Sweeps Cash, which is another form of currency with monetary value.[1] This is the true nature of its business

---

[1]  According to player reviews, My Prize's most enticing feature is its bonus bundle options and reward program. https://www.dimers.com/sweepstakes-casinos/myprize-us (last visited August 20, 2025).  Upon registration, new users automatically receive 1,000 Gold Coins and 1 Sweeps Cash. https://next.io/sweepstakes-casinos-us/myprize-us/ (last visited August 20, 2025).

model.

10.    Players use Sweeps Cash to enter sweepstakes-style games, which offer the chance to win cash or gift cards.

11.    To participate in sweepstakes games with the potential to win real prizes, players use Sweeps Cash. After fulfilling a 1x playthrough requirement and collecting a minimum of 100 Sweeps Cash, players can redeem them for cash prizes only through the USDC on Ethereum payment method. In short, a user playing games using Sweeps Cash is gambling in the purest sense—they are wagering something of value (Sweeps Cash) on a random event with the hope and intent of winning more Sweeps Cash than wagered to then redeem for cash and monetary prizes.

12.    Defendant's pricing structure confirms that the true purpose of these transactions is to sell Sweeps Cash. Notwithstanding the difference between the coins, the games are purely games of chance; they require little to no skill to determine the outcome.

13.    Virtual gambling is highly addictive. Moreover, under Alabama law, gambling is strictly regulated. The state's regulatory framework mandates that such games may only be offered by licensed operators at approved physical locations. My Prize's operations flout these legal requirements by providing unlicensed gambling services to Alabama residents via the internet.

14.    Plaintiff, individually and on behalf of all other similarly situated, seeks all available remedies at law and equity, including damages, restitution, declaratory, and injunctive relief.

## PARTIES

15.    At all times material hereto, Plaintiff Amy Hurst has been a resident of Chambers County, Alabama.

16.    Defendant My Technology Inc. is a company formed in Delaware and with its

headquarters at 6900 Veronese St., Coral Gables, FL 33146. owns and operates a gambling website (available at https://myprize.us) Defendant conducts business within the venue of this District and throughout Alabama generally, which websites and operations are not permitted and are illegal under Alabama law.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the amount in controversy, exclusive of costs and interest, exceeds the sum of $5,000,000.00, (2) the proposed Class is comprised of at least 100 members, and (3) complete diversity exists between at least one plaintiff and one defendant.

18.    This Court has personal jurisdiction over Defendant because, as further described below, Defendant does business and is authorized to conduct business here. Defendant sells its products to consumers in Alabama, including to Plaintiff.

19.    Moreover, Defendant conducts business in Alabama and actively disseminates targeted advertisements within the state with the intent of promoting and selling its products and services to consumers there. As such, Defendant does business with sufficient minimum contacts in Alabama, and/or otherwise intentionally avails itself of the Alabama market.

20.    Defendant has purposefully directed its activities toward this District.

21.    Defendant has purposefully availed itself of the privileges of conducting activities in this District.

22.    Defendant's claim arises out and relates to Defendant's forum-related activities.

23.    The exercise of jurisdiction over Defendant is reasonable.

24.    Upon information and belief, Defendant localizes its game for each market where it is distributed, including the United States.

25.     Upon information and belief, Defendant has sold millions of dollars of virtual items to thousands of Alabama residents, most of which are repeat purchases by the same customers, by contracting with the customers to sell virtual coins and other goods in exchange for legal tender.

26.     My Prize facilitates ongoing economic activity between thousands of Alabama players and Defendant.

27.     Upon information and belief, Defendant directly controls whether consumers in Alabama can complete purchases from My Prize.

28.     Upon information and belief, Defendant has the capability to determine where its customers are from, including whether purchases are being made from Alabama.

29.     Upon information and belief, Defendant has the capability to prevent Alabama residents from completing purchases or placing wagers in My Prize but has chosen to accept those purchases and wagers from Alabama residents. For example, other gambling applications prevent transactions from residents of states where gambling is unlawful.

30.     Upon information and belief, Defendant has taken no steps to restrict Alabama residents' access to My Prize or to restrict the ability of Alabama residents to make purchases from My Prize.

31.     Defendant aggressively advertises My Prize in the United States, including in this District. Those advertisements include linear media, social media advertisements and advertisements in other mobile applications.

32.     Upon information and belief, these advertisements for My Prize were designed and directed to attract consumers in the United States, including this District, to play My Prize.

33.     Upon information and belief, Defendant has the capability of targeting its My Prize advertisements by geography and the capability of excluding residents of Alabama from the reach

of Defendant's advertisements for My Prize.

34.    Upon information and belief, Defendant partners with Meta Platforms, Inc. to serve targeted online ads at users of other companies' websites, games and online services. Upon information and belief, these ads are targeted at players that Defendant identifies as potentially interested in My Prize, including residents of Alabama. Upon information and belief, Defendant utilizes unique device identifiers and Google Advertising ID and IP addresses in connection with these targeted ads. This information allows Defendant to identify the geographic location of its ad targets, including whether they are in Alabama.

35.    Upon information and belief, Defendant has taken no steps to restrict its advertisements for My Prize from reaching residents of Alabama.

36.    Plaintiff alleges, upon information and belief, that Defendant conducts professional and commercial activities in Alabama on a substantial, continuous, and systematic basis and therefore Defendant is subject to the general jurisdiction of the courts of this state.

37.    Plaintiff further alleges, upon information and belief, that the claims asserted in this complaint arise out of or are related to each of the Defendant's professional and commercial activities within Alabama, and therefore the Defendant is subject to the specific jurisdiction of the courts of this state.

38.    Venue is proper in this District under 28 U.S.C. §1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this District. All of Plaintiff's activities and losses in My Prize occurred in this District.

39.    Venue is also proper in this District under 28 U.S.C. §1391(b)(1) and §1391(b)(3), in that Defendant is subject to this Court's personal jurisdiction.

40.    The amount in controversy exceeds the jurisdictional minimum of this Court.

## FACTUAL BACKGROUND AND COMMON ALLEGATIONS

I.  *The Problem of Online Gambling*

41.    Gambling addiction in the United States has escalated into a significant public health crisis, fueled by the rapid expansion of online casinos and sports betting platforms, including so called "social casinos."

42.    Since the Supreme Court's 2018 decision to legalize sports betting, the number of states with legal sportsbooks has surged from 1 to 38, with total sports wagers increasing from $4.9 billion in 2017 to $121.1 billion in 2023.[2] This proliferation has been accompanied by a dramatic rise in gambling addiction cases.[3]

43.    Approximately 2.5 million adults in the U.S. suffer from severe gambling problems, while an additional five to eight million experiencing significant issues.[4] Alarmingly, individuals with gambling disorders are 15 times more likely to commit suicide than the general population.[5]

44.    Between 2018 and 2021, the Nation Council on Problem Gambling (NCPG) estimated that the risk of gambling addiction grew by 30%. NCPG has also seen significant increases in calls, texts and chats to the National Problem Gambling Helpline—roughly a 45% increase in calls between 2021 and 2022.[6]

---

[2] UC SAN DIEGO TODAY, https://today.ucsd.edu/story/study-reveals-surge-in-gambling-addiction -following-legalization-of-sports-betting (last visited June 30, 2025).

[3] *See id.*

[4] Clea Simon, *Gambling problems are mushrooming*, THE HARVARD GAZETTE, https://news. harvard.edu/gazette/story/2025/01/online-gambling-is-on-the-rise-panel-says-we-need-to-act-no w/#:~:text=The%20National%20Council%20on%20Problem%20Gambling%20estimates%20th at%20about%202.5,of%20callers%20is%20skewing%20younger (last visited June 30, 2025).

[5] WORLD HEALTH ORGANIZATION, https://www.who.int/news-room/fact-sheets/detail/gambling #:~:text=A%20Swedish %20study%20estimated%20that,the%20general%20population%20(4) (last visited June 30, 2025).

[6] Cait Huble, *NCPG Statement on the Betting on Our Future Act*, NATIONAL COUNCIL ON PROBLEM GAMBLING, https://www.ncpgambling.org/news/ncpg-statement-on-the-betting-on- our-future-act (last visited May 28, 2025).

45.    Further, internet searches for help with gambling addiction, such as "am I addicted to gambling", have cumulatively increased 23% nationally since *Murphy v. NCAA* through June 2024. This corresponds with approximately 6.5 to 7.3 million searches for gambling addiction help-seeking nationally, with 180,000 monthly searches at its peak.[7]

46.    The surge in gambling addiction is particularly pronounced among young men, with 10% exhibiting behaviors indicative of gambling addiction, compared to 3% of the general population.[8] Online platforms, including social casinos, have been identified as significant contributors to this trend. These platforms often employ addictive design features, such as near-miss outcomes, fake limited-time sales, and variable reinforcement, to keep users engaged.

47.    The addiction and fallout related thereto is not limited to gamblers. It has a ripple effect that negatively impacts spouses, partners, children, and employers. Moreover, despite the growing prevalence of gambling addiction, funding for treatment remains insufficient.

48.    In Alabama, it is illegal to operate and offer online gambling casinos, including websites that offer slot machines, blackjack, roulette, and poker. *See generally* Ala. Code §§ 13A-12-20 *et. seq.* In this regard, Alabama has a fundamental and deep-rooted public policy against gambling.

**II.      *Defendant Uses Free "Social Gaming" as a Pretext for Real, Online Gambling.***

49.    My Prize advertises itself as a "social casino" that is "ALWAYS FREE" and "free to play" to avoid gambling regulations and reassure potential players that it offers casino-style games purely for entertainment, without real-money stakes. This false representation misleads consumers,

---

[7]  UC SAN DIEGO TODAY, https://today.ucsd.edu/story/study-reveals-surge-in-gambling-addiction-following-legalization-of-sports-betting (last visited May 28, 2025).
[8]  Wayne Parry, ASSOCIATED PRESS, *Poll shows young men in the US are more at risk for gambling addiction than the general population,* https://apnews.com/article/sports-betting-compulsive-gambling-addiction-d4d0b7a8465e5be0b451b115cab0fb15 (last visited May 28, 2025).

including Plaintiff, into believing that they are participating in harmless gameplay rather than actual-money gambling, even when wagering with Sweeps Cash. In doing so, My Prize enables users to engage in real-money gambling through its system of Sweeps Cash, deceiving consumers into believing they are participating in harmless gameplay when, in fact, they are wagering something of value for the chance to win tangible prizes.

50.     Players can access My Prize through the internet website.

51.     Once a player creates a My Prize account, they receive a welcome bonus that ranges from 4,000 to 11,000 Gold Coins and .6-1.6 Sweeps Cash and can choose to either wager Gold Coins or with Sweeps Cash. In the screenshot below, the welcome bonus was 8,000 Gold Coins and 1 Sweeps Cash.



52.     When players log onto the website, they are met with rows of games to choose from, including slots, roulette, poler, and blackjack.



53.     Before playing a game, players must select their play mode (either Gold Coins or Sweeps Cash) by clicking the option in the top-center menu of the website.



54.     Once a mode is selected, games allow players to games allow players to wager the corresponding type of coin. Depending on the outcome of the spin or play, a player may earn more coins. Defendant makes it easy to switch between wagering the two Coins. This simple mechanism is designed to make it as convenient as possible for players to transition to gambling with real-world stakes. Players who start out having fun can quickly and effortlessly shift to risking actual money without fully appreciating the financial consequences.



55.    In addition to its catalog of virtual games, Defendant further enhances the realism of its platform by offering "Live Dealer Games." These games are advertised as allowing players to "interact with human dealers" and to "experience what it would be like to be at a land-based casino while you're sitting comfortably at home behind your computer screen or on your mobile device.

56.    In these Live Dealer Games, players wager Sweeps Cash, interact with dealers and other participants via live chat, and observe -time video streams of human dealers managing casino activities such as card dealing and roulette spins. The immersive and lifelike nature of these features intensifies the gambling experience, making it virtually indistinguishable from participating in a traditional, brick-and-mortar casino.

57.    In short, the slots, slots, blackjack, and other games of chance offered on the website are gambling, and they are no different than if they were played in a Las Vegas casino.

58.    Consumers visiting the website for the first time are awarded an allocation of free Gold Coins and Sweeps Cash. Consumers also receive Gold Coins and Sweeps Cash through

promotional giveaways and other marketing efforts such as daily rewards to entice users to keep playing and wagering on My Prize.

59.    Consumers also may use Sweeps Cash to play games on the platform. Sweeps Cash is redeemable for cash prizes and gift cards. Upon information and belief, each Sweeps Cash is equal in value to $1 USD in prizes, rendering Sweeps Cash a proxy for real money.

60.    Consumers can receive Sweeps Cash in multiple ways, including by purchasing specifically marked packs of Gold Coins, promotions, participating in giveaways, or completing daily missions. The most common way, however, for users to obtain Sweeps Cash is to purchase Gold Coins (i.e., the more Gold Coins a user purchases, the more Sweeps Cash the user receives as a bonus). So, in effect, when a person buys Gold Coins, they are also generally buying Sweeps Cash, though Defendant falsely markets the sale as Sweeps Cash being an added "bonus" added to the purchase. The following screenshot is taken from Defendant's in-game "store."



61.    Players then gamble using Sweeps Cash that they would play with Gold Coins. In short, a user playing the chance-based games with Sweeps Cash is gambling in the purest sense – they are wagering something of value on a random event with the hope and intent of winning more Sweeps Cash than wagered to then receive tangible rewards and prizes that have monetary value.

62.    Plaintiff and, upon information and belief, the vast majority of players on the Defendant's platform regularly buy additional coin bundles when they run out of Sweeps Cash even when they already possess unused Gold Coins. The fact that players are making these repeated purchases when they have ample Gold Coins confirm that these transactions are driven entirely by the desire to obtain Sweeps Cash for real-money gambling, rather than for the Gold Coins that Defendant sells.

63.    Players may acquire Sweeps Cash through various means, including promotional giveaways, participation in contests or daily missions, and most commonly, through the purchase of Gold Coins. The more Gold Coins a user buys, the more Sweeps Cash they receive as an alleged "free bonus." In reality, Defendant uses the sale of Gold Coins as a vehicle for the sale of Sweeps Cash, misleadingly marketing the transaction to obscure the real-money nature of the exchange.

64.    Once obtained, users gamble with Sweeps Cash in the same manner as they do with Gold Coins. However, because Sweeps Cash are redeemable for real-world value, users who wager Sweeps Cash are engaging in gambling: staking something of value on an event determined predominantly by chance with the expectation of winning additional value in the form of redeemable prizes.

65.    Furthermore, Defendant imposes a "1x playthrough" requirement on bonus Sweeps Cash,  mandating that players must wager an amount equal to the number of bonus Sweeps Cash they wish to withdraw before any redemption is permitted. For example, to withdraw 25 Sweeps

Cash, a player must first wager at least 25 Sweeps Cash on casino-style games offered through the My Prize platform. Further, before a player is permitted to redeem any Sweeps Cash they must first win a minimum of 100 Sweeps Cash. This restrictive condition significantly impairs users' ability to redeem winnings and effectively forces continued gambling activity. The playthrough requirement operates as a coercive mechanism, compelling users to risk further losses under the guise of accessing previously earned rewards. This practice is misleading, particularly when users are initially lured to the platform by representations that it is merely a "social casino" offering free-to-play entertainment. In reality, the platform's design systematically incentivizes and prolongs gambling behavior while obscuring the difficulty of actually obtaining monetary rewards—underscoring the predatory nature of Defendant's operations.

66.    Alabama Code §§ 13A-12-20(5) broadly defines a "gambling device" as "any device, machine, paraphernalia or equipment that is normally used or usable in the playing phases of any gambling activity, whether that activity consists of gambling between persons or gambling by a person involving the playing of a machine."

67.    Alabama Code §§ 13A-12-20(10) broadly defines a "slot machine" as "a gambling device that, as a result of the insertion of a coin or other object, operates, either completely automatically or with the aid of some physical act by the player, in such a manner that, depending upon elements of chance, it may eject something of value. A device so constructed or readily adaptable or convertible to such use is no less a slot machine because it is not in working order or because some mechanical act of manipulation or repair is required to accomplish its adaptation, conversion or workability. Nor is it any less a slot machine because apart from its use or adaptability as such it may also sell or deliver something of value on a basis other than chance."

68.    Alabama Code §§ 13A-12-20(11) broadly defines "something of value" as "any

money or property, any token, object or article exchangeable for money or property or any form of credit or promise directly or indirectly contemplating transfer of money or property or of any interest therein, or involving extension of a service entertainment or a privilege of playing at a game or scheme without charge."

69.    Players of My Prize stake or risk something of value when playing the games of chance offered on Defendant's platform. Specifically, players use Sweeps Cash to play various casino-style games, the outcomes of which are determined predominantly by chance rather than skill. When using Sweeps Cash, players risk this currency for the opportunity to win additional Sweeps Cash, which can ultimately be redeemed for cash-value prizes. If the player wins, they retain and often multiply the Sweeps Cash they staked; if they lose, those Sweeps Cash are forfeited. This distinguishes My Prize from traditional video games, where a user expends in-game currency as a fee to play, irrespective of win or loss. In My Prize, however, players either maintain and grow their balance, or lose it, based on the results of chance-based games, closely resembling the mechanics of real-world money gambling

70.    While My Prize's games require some level of user interaction, the outcomes of My Prize's games are overwhelmingly determined by chance. Games such as digital slots, roulette, and lottery-style spins rely on random number generators or similar chance-based algorithms. Upon information and belief, the results of these games are not influenced by any player skill or decision-making, but are driven entirely by software that introduces randomness. As such, the element of chance predominates in determining game outcomes.

71.    The limited degree of user interaction does not remove My Prize's games from the

statutory definition of a "game of chance" or "contest of chance" under Alabama law.[9] Games commonly recognized as gambling, such as blackjack, craps, and interactive slot machines, also incorporate some player decisions or interactivity. My Prize closely resembles so-called "I-Slots" (interactive slot machines), which allow limited user choice but are still fundamentally games of chance. The presence of user interaction in My Prize does not negate the dominance of chance in determining outcomes.

72.    Even players with significant experience or familiarity with casino-style games can lose repeatedly if the game's randomizing mechanism is not favorable. Conversely, novice or inexperienced users may win if the randomized outcome happens to align in their favor. This inherent unpredictability underscores that the dominant factor in the outcome of each game is chance—not skill, strategy, or experience.

73.    Gold Coins and Sweeps Cash in My Prize constitute things of value under Alabama law and other applicable gambling statutes. These coins provide players with access to services, entertainment, and the privilege of continued gameplay without charge. Sweeps Cash, in particular, function as a "representative of value" because they are redeemable for real-world prizes, including cash and gift cards.

74.    The casino-style games on My Prize closely mimic the experience of traditional gambling establishments. These games feature audiovisual elements—including slot machine graphics, sounds, animations, and game mechanics—that replicate the look and feel of real-world casino games, further blurring the line between entertainment and gambling.

### III.    *Defendant Resurrects Internet Sweepstakes Café Model from Early 2000s*

---

[9] "Any contest, game, gaming scheme or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein." ALA. CODE § 13A-12-20(3).

75.    In the early 2000s, a widespread trend emerged in which unscrupulous operators attempted to circumvent state gambling laws by establishing so-called "Internet cafés." These businesses—often set up in suburban strip malls—purported to sell innocuous products such as internet access or long-distance calling minutes. In reality, the purchase of those goods was merely a front for what amounted to casino-style gambling: customers received "free" sweepstakes entries with each purchase, which they could then use to play slot machine-style games on computer terminals, with the chance to win real cash prizes.

76.    Most state gambling statutes define gambling as involving three core elements: (1) consideration, (2) chance, and (3) a prize. Operators of these Internet cafés attempted to sidestep the "consideration" element by claiming that the sweepstakes entries were promotional add-ons to legitimate purchases, akin to promotional sweepstakes run by large commercial brands. But this separation was illusory; the primary and intended purpose of the transaction was to enable gambling.

77.    Courts and law enforcement agencies across the United States uniformly concluded that these so-called sweepstakes promotions were thinly veiled gambling operations, and moved to shut them down under applicable state gambling laws.

78.    In *Barber v. Jefferson Cty. Racing Ass'n, Inc.*, 960 So.2d 599 (Ala. 2006), the Alabama Supreme Court dealt a decisive blow to the Internet café defense. There, operators sold internet time while offering customers 100 "sweepstakes entries" for every dollar spent. They argued that the entries were not gambling because customers were buying a product (internet time), and had the option to request free entries by mail. The court rejected these arguments, holding that the operation constituted illegal gambling despite these superficial distinctions. *See id.* at 612.

79.    *Barber* reflects a broad consensus among courts nationwide: the use of nominal

product sales or alternative free-entry routes does not shield operators from liability when the dominant purpose of the enterprise is gambling. The underlying structure—consideration exchanged for a chance to win a prize through a game of chance—remains unchanged and unlawful.

80.    My Prize now attempts to revive this discredited model. Defendant will urge the Court to accept the fiction that its operations are not gambling, but rather legal "sweepstakes" entertainment. That argument is not new—it is the same tactic employed by illegal gambling outfits in the early 2000s, which courts and regulators uniformly rejected.

81.    As detailed below, My Prize employs a structurally identical business model: users ostensibly purchase "virtual coins" but receive "Sweeps Cash"—with real-world value—for use in casino-style games of chance. The inclusion of token "free" methods of entry and the marketing language around "sweepstakes" do not change the underlying legal reality. Courts have consistently found such models to be unlawful.

82.    Indeed, in *Larsen v. PTT, LLC*, 737 F. Supp. 3d 1076 (W.D. Wash. 2024), a federal court granted summary judgment against an online gaming operator whose structure mirrored My Prize's.

83.    Defendant's attempt to rebrand illegal online gambling as a sweepstakes promotion is part of a familiar pattern already discredited by courts, regulators, and the public. My Prize's operations are not novel—they are a modern replica of a failed and unlawful model.

**IV.    *All Purported Contracts with Defendant Are Void***

84.    There are two independent and legally sufficient grounds upon which any purported contract with Defendant is void and unenforceable.

85.    In Alabama, "[a]ll contracts founded in whole or in part on a gambling consideration

are void." Ala. Code §8-1-150 (2024).

86.    Thus, no contract was ever formed between the parties, and any purported contract between Plaintiff and Defendant, and any contractually based defenses Defendant may raise are likewise void.

87.    And the *entire* contract is void, because "even if the arbitration provision is severed from the rest of any 'contract,' the arbitration provision itself is void as a matter of law pursuant to § 8–1–150." *Macon Cnty. Greyhound Park, Inc. v. Hoffman*, 226 So. 3d 152, 167 (Ala. 2016).

88.    Even if not void, they are unconscionable as the terms and conditions is an adhesion contract.

89.    Parties cannot contractually agree to engage in conduct that is criminal or otherwise contrary to public policy. Just as a person cannot lawfully contract to engage in forced labor, sex trafficking, illicit drug sales, or other illegal conduct, neither can they enter into a valid and enforceable agreement to participate in unlawful gambling. Any purported contractual relationship between Plaintiff and Defendant—premised on participation in illegal gambling activity—is therefore void ab initio.

90.    Accordingly, Plaintiff hereby voids any purported agreement or contract between herself and Defendant. As a result, Defendant may not invoke any contractual defenses—including arbitration clauses, choice-of-law provisions, or class action waivers—because no valid or enforceable agreement exists.

### **FACTS SPECIFIC TO PLAINTIFF**

***Plaintiff Amy Hurst's Experience***

91.    Plaintiff Hurst played My Prize from approximately November 2024 to April 2025 during which she made many in-game purchases of Gold Coins and Sweeps Cash.

92.     Plaintiff Hurst accessed My Prize from her residence in Alabama. Hurst received an initial allotment of Gold Coins and Sweeps Cash. After losing her initial allocation of free Gold Coins and Sweeps Cash, she began purchasing Sweeps Cash from Defendant and did so from Alabama, which Defendant accepted.

93.     Plaintiff Hurst placed all of her wagers in My Prize in Alabama.

94.     Overall, Plaintiff Hurst wagered and lost approximately $5,700.00 in real-world currency while using My Prize and its games of chance. She lost the Sweeps Cash she purchased from Defendant by wagering them in My Prize's games of chance.

95.     By and through My Prize's gambling features described above during the time period of approximately November 2024 to April 2025, Hurst was induced into making these purchases that she otherwise would not have made.

96.     As a result of Defendant's unfair, unlawful, and deceptive acts, Defendant was unjustly enriched.

97.     Plaintiff Hurst enjoys playing online games and has an ongoing interest in playing My Prize if it were to change to be devoid of unlawful, deceptive and unfair business practices. Plaintiff Hurst therefore has an ongoing interest in My Prize complying with state and federal gambling laws and consumer protection statutes.

## CLASS ALLEGATIONS

98.     Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b) on behalf of themselves and all others similarly situated defined as follows:

99.     The Class is defined as follows:

> All Alabama residents who, during the applicable limitations period, played and lost money wagering on Defendant's online casino games.

100.     **Numerosity.** Upon information and belief, there are hundreds, if not thousands, of

Class members, so joinder of all members is impracticable. The precise number of class members and their identifies are unknown to Plaintiff currently but may be ascertained from Defendant's books and records and other third-party sources.

101.    **Commonality.** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

a.    Whether the games in My Prize are gambling as defined under Alabama law;

b.    Whether Defendant engaged in the conduct alleged in the Complaint;

c.    Whether Defendant violates the statutes listed below in Counts I and II;

d.    Whether Defendant violated statutes analogous to those alleged herein applicable;

e.    Whether and how Defendant manipulates the odds in games offered in My Prize;

f.    Whether Plaintiff and the other Class members were damaged by Defendant's conduct; and

g.    Whether Plaintiff and the other Class members are entitled to  restitution or other relief.

102.    **Typicality**. Plaintiff's claims are typical of the claims of the Class because they were players of My Prize who made in-game purchases of coins and wagered such coins as a result of Defendant's unlawful and wrongful conduct. The factual and legal basis of Defendant's liability to Plaintiff and to the other Class members are the same, resulting in injury to the Plaintiff and to all of the other members of the Class. Plaintiff and the other members of the Class have suffered harm and damages due to Defendant's unlawful and wrongful conduct.

103.    **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of

the other members of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Plaintiff nor her counsel have any interest adverse to those of the other members of the Class.

104.    **Predominance & Superiority.** Absent a class action, most Class members would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. The damages or other financial detriment suffered by Plaintiff and putative class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the proposed Class to individually seek redress for Defendant's wrongful conduct.

105.    **Final Declaratory or Injunctive Relief.** Defendant has acted and failed to act on grounds generally applicable to the Plaintiff and the Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making injunctive or corresponding declaratory relief appropriate for the Class as a whole.

**FIRST CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**28 U.S.C. §§2201 *et seq.***

106.    Plaintiff incorporates by reference the allegations contained in paragraphs 1-105 of this Complaint.

107.    Plaintiff brings this count individually and on behalf of all other Class members.

108.    Alabama law strongly prohibits any form of gambling.

109.    In fact, gambling is constitutionally prohibited. Ala. Const., Art. IV, §65.

110.    In Alabama, gambling occurs when one "stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under her control or influence, upon an agreement or understanding that he or someone else will receive something of value in the event of a certain outcome." ALA. CODE § 13A-12-20(4).

111.    In Alabama, "Something of value" is defined as "[a]ny money or property, ... or article exchangeable for money or property or any form of credit or promise directly or indirectly contemplating transfer of money or property or of any interest therein or involving extension of a service entertainment or a privilege of playing at a ... scheme without charge." ALA. CODE § 13A-12-20(10).

112.    In Alabama, a game is chance-based, not skill-based, when more chance is involved in the outcome than skill. My Prize operates an illegal gambling website wherein participants pay consideration for the chance to win a prize.

113.    The Chance Games offered by My Prize are predominantly games of chance and do not involve any level of skill.

114.    The prizes My Prize offers are valuable and can be used as or converted into US currency.

115.    My Prize operates an online casino, not a sweepstakes. In Alabama, even though the player is assured of her money's worth of some commodity and hence cannot lose, it is still illegal gambling. In fact, even paying back up to 98% of all money played is illegal gambling (where the typical sweepstakes payout is 50%). And the duration of traditional sweepstakes is limited, not indefinite, like My Prize. And just because Plaintiff and Class members can play for free does not

save My Prize. The Alabama Supreme Court has long held that the availability of free chances is not necessarily dispositive of whether the game is a gambling scheme: "That the prize may go to someone who has paid nothing does not negative the fact that many have paid for their chance. Because some have not been drawn into the gambling phase does not render it any the less a lottery, with whatever of evil it engenders, as to the large public who have paid." *Barber v. Jefferson Cnty. Racing Ass'n, Inc.*, 960 So. 2d 599, 614 (Ala. 2006) (*quoting Grimes v. State*, 178 So. 73, 74 (Ala. 1937)). Moreover, My Prize does not promote or market a good or service, it is the good or service. And My Prize does not offer any free-play tokens available at any location in Alabama.

116.    Plaintiff and Class members each paid money or other things of value to My Prize to play the Chance Games for the sole purpose of winning a prize.

117.    Plaintiff and Class members seek an order declaring that (1) My Prize is illegal gambling in Alabama and (2) any authority under which it purports to operate is unconstitutional, as well as a permanent injunction enjoining Defendant from operating My Prize in Alabama, with disgorgement of profits.

118.    Plaintiff and Class members also seek a speedy declaratory judgment hearing pursuant to Fed. R. Civ P. 57.

### SECOND CAUSE OF ACTION
### ALABAMA GAMBLING LOSS RECOVERY STATUTE
### Ala. Code §§ 8-1-150, *et seq.*

119.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–105 by reference as if fully set forth herein.

120.    Plaintiff brings this count individually and on behalf of all other Class members.

121.    Plaintiff is similarly situated as other Class members, as each are Alabama residents who have either paid and lost money or other things of value on My Prize in the last six months,

or are the spouse, child, or next of kin of an Alabama resident who paid and lost money or other things of value on My Prize in the last six months.

122.    My Prize operates an illegal gambling website that is accessible in Alabama.

123.    In the last six months, Plaintiff and other Class members paid and lost money or other things of value to Defendant on My Prize.

124.    Plaintiff and other Class members demand recovery of the money or other things of value paid and lost to Defendant on My Prize in the last six months in an amount to be determined at trial, including interest.

125.    Plaintiff also seeks recovery of money or other things paid and lost on My Prize in the last twelve months on behalf of the spouses, children, and next of kin of the losers.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of all others similarly situated, the following relief:

1.    For an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, defining the Class as requested herein, appointing Plaintiff as class representative and her counsel as class counsel;

2.    Awarding Plaintiff all economic, monetary, actual, consequential, compensatory, and punitive damages available at law and to be determined by proof;

3.    Awarding Plaintiff and the class members appropriate relief, including actual and statutory damages;

4.    Awarding Plaintiff's reasonable attorneys' fees, costs, and other litigation expenses;

5.    Awarding pre- and post-judgment interest, as allowable by law;

6. For an order enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

7. Declaratory and equitable relief, including restitution and disgorgement;

8. For public injunctive relief as the Court may deem proper; and

9. Awarding such further and other relief as the Court deems just, proper and equitable.

<u>**JURY DEMAND**</u>

Plaintiff requests trial by jury of all claims that can be so tried.

Dated: September 12, 2025                    Respectfully submitted,

*/s/ David L. Selby, II*
David L. Selby, II (ASB-6994-Y62D)
Matthew J. Ford (ASB-6725-W58F)
BAILEY & GLASSER, LLP
3000 Riverchase Galleria, Suite 905
Birmingham, Alabama 35244
T:      (205) 988-9253
F       (205) 733-4896
E:      dselby@baileyglasser.com
         mford@baileyglasser.com

Scott Edelsberg (*pro hac vice forthcoming*)
EDELSBERG LAW, P.A.
20900 NE 30th Ave., Suite 417
Aventura, Florida 33180
T:      (305) 975-3320
E:      scott@edelsberglaw.com

Edwin E. Elliott (*pro hac vice forthcoming*)
SHAMIS & GENTILE, P.A.
14 NE 1st Ave, Suite 705
Miami, FL 33132
(305) 479-2299
edwine@shamisgentile.com

*Counsel for Plaintiff and the Proposed Class*